UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
RANDOLPH ROSSI,                                                 :

                             Plaintiff,                  :          13cv3167 (PKC) (DF)

           -against-                                  :          **SUPPLEMENTAL REPORT
                                               AND RECOMMENDATION**

BRIAN FISCHER, et al.,                                         :

                           Defendants.                :
----------------------------------------------------------------X

**TO THE HONORABLE P. KEVIN CASTEL, U.S.D.J.:**

       This matter has been referred to me to report and recommend on the motion by *pro se*

plaintiff Randolph Rossi ("Plaintiff") for a preliminary injunction against the Commissioner and

other officials of the New York State Department of Corrections and Community Supervision

("DOCCS") (collectively, "Defendants"), related to the practice of Plaintiff's Rastafari faith

while incarcerated.  (*See* Dkt. 17.)  With the parties' consent, this Court bifurcated Plaintiff's

preliminary injunction motion and earlier issued a Report and Recommendation as to Plaintiff's

ability to celebrate April 21 as a holy day.  (Dkt. 27.)  In this Supplemental Report and

Recommendation, this Court *sua sponte* re-examines some of the issues regarding April 21

(given that Defendants have now made modifications to the DOCCS holiday calendar that alter

the record before the Court, and that, with respect to holiday celebrations in general, this Court

now has a more substantial record before it), and also addresses the remaining issues raised by

Plaintiff's motion.

       For the reasons explained below, I recommend that Plaintiff's motion be granted in part

and denied in part.

## PROCEDURAL HISTORY

### A.   Plaintiff's Amended Complaint and Preliminary Injunction Motion

Plaintiff filed an Amended Complaint on November 8, 2013,[1] alleging that Defendants had violated, and continued to violate, his constitutional rights, pursuant to 42 U.S.C. § 1983, by denying him the ability to practice his religion in prison.  (*See* Dkt. 11.)  On March 4, 2014,[2] he sought a preliminary injunction with respect to several of Defendants' allegedly objectionable policies and practices.  (*See* Dkt. 17.)  In particular, Plaintiff, as a practicing Rastafari, sought to enjoin Defendants' prohibitions against (1) his wearing of a religious turban, (2) his celebration of certain religious holy days in a manner consistent with his beliefs, and (3) his being able to engage in congregate worship on Fridays, consistent with the Sabbath observance of his faith.  In addition, Plaintiff sought to enjoin Defendants' practice of collecting (and using for unspecified general purposes) 50 percent of the funds raised by the Rastafari inmate organization, which, according to Plaintiff, would otherwise use those funds to support Rastafari religious practices.

With the parties' consent, this Court bifurcated the preliminary injunction motion, so as to address, first, Plaintiff's claimed right to observe a particular religious holy day (April 21) that was, at that time, rapidly approaching.  Before this Court issued its first report and recommendation, though, Defendants voluntarily agreed to permit Plaintiff to observe that holy day, by exempting him from work and programming for the day and providing him with a meal

---

[1] Although the docket of this case reflects a filing date of November 19, 2013, a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the Court.  *See Houston v. Lack*, 487 U.S. 266, 270 (1988).  Thus, in the absence of evidence to the contrary, the Court will deem the Amended Complaint to have been filed on November 8, 2013, the date Plaintiff signed it.  *See, e.g., Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).

[2] The docket reflects a filing date of March 12, 2014.  (*See supra* n.1.)

that would purportedly comport with his dietary restrictions.  (*See* Dkt. 22.)  This Court thus determined that certain aspects of Plaintiff's preliminary injunction motion had been rendered moot, and did not address the entirety of Plaintiff's claims regarding the April 21 holiday. Rather, this Court made only limited recommendations (*see* Dkt. 27), which were then adopted by Judge Castel (Castel, J.).  (Dkt. 37.)  One of those adopted recommendations was that preliminary injunctive relief be denied as to Plaintiff's request to be provided with a congregate worship service on April 21.  (*See* Dkts. 27, 37.)  The reason for that particular recommendation was that the evidentiary record, at the time, was insufficient to show that Plaintiff was likely to prevail on his claim that such a service was constitutionally required.  (*See* Dkt. 27, at 9.)

On May 8, 2014,[3] Plaintiff filed a notice of interlocutory appeal to the Second Circuit.[4] (Dkt. 45.)

**B.** **This Court's Scheduling of an Evidentiary Hearing, and Defendants' Revision to the DOCCS Holiday Calendar**

With respect to any claims not already addressed by the Court, this Court set a schedule for expedited discovery and an in-person evidentiary hearing date of May 19, 2014, cognizant of the fact that certain of Plaintiff's claims were allegedly implicating daily or weekly deprivations

---

[3] The docket reflects a filing date of May 16, 2014.  (*See supra* n.1.)

[4] Despite this appeal, this Court retains jurisdiction over the issues addressed in this report, as they differ from those raised and decided in the Order on appeal.  *See, e.g., New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1350 (2d Cir. 1989).  Although this Court is again considering aspects of Plaintiff's claimed right to observe April 21 as a holy day, the Court's prior Order, issued after Defendants had agreed to provide Plaintiff with certain privileges for April 21, 2014, addressed only whether Defendants were required to afford Plaintiff the opportunity to engage in congregate worship on that day.  (*See* Dkts. 27, 37.)  In contrast, based on new representations by Defendants as to the privileges they are prepared to afford Plaintiff going forward, this report addresses Plaintiff's claimed right to be exempt from work and programming on April 21, to be provided with a special holy day meal on that day, and to have the day designated as a "family event."  (*See* Section II(B)(2) *infra*.)

of his religious liberties (including his claimed right to wear a turban and to engage in congregate Sabbath worship), and that another of his claims involved the potential celebration of holy days that were again approaching.  Nonetheless, with Plaintiff's consent, the Court twice granted requests by Defendants to adjourn the hearing, which was eventually rescheduled to commence on July 8, 2014.  (*See* Dkts. 42, 47, 55.)

Then, one day before the hearing was to begin, Defendants' counsel submitted a letter to the Court, indicating that, because Plaintiff had not responded to discovery requests, Defendants were purportedly unprepared "to respond to any specific claim plaintiff may advance."  (*See* Letter to the Court from Anna Hehenberger, Esq., dated July 7, 2014 (Dkt. 61).)  In addition, Defendants' counsel attached a letter dated July 1, 2014, which they had received from defendant Jeff McKoy,[5] stating that the DOCCS Religious Holiday Calendar had been revised to include additional Rastafari holy days, including *all* of the holidays that Plaintiff had sought permission to celebrate.  (*See* Letter to Anna Hehenberger, Esq., from Jeff McKoy, dated July 1, 2014 ("McKoy Ltr.") (Dkt. 61-1).)[6]

The McKoy letter, however, did not state that each newly added holiday could be celebrated by Rastafari inmates in the same way.  Specifically, as to those holidays at issue on Plaintiff's motion, the letter stated that, on "Goundation/Groundation Day" (April 21), inmates would be "authorized to attend a congregate worship service and then return to work/programs," that, on "Africa OAU/AU Day" (May 25), inmates would be "allowed individual worship in

---

[5] This defendant's last name is spelled "McCoy" on the docket of this case.

[6] Plaintiff was only informed of these revisions to the Calendar at the commencement of the hearing, as he had already been transported to the Metropolitan Correctional Center ("MCC") for the purpose of testifying in these proceedings at the time that Defendants sent the letter.  (*See* Transcript of Hearing, dated July 8-9, 2014 (Dkts. 64, 66) ("July Tr."), at 4.)

4

their cell[s]," that, on "Prophet Marcus Mosiah Garvey Day" (August 17) and "Negus[] Day" (October 7), inmates would be "authorized as exempt from work and programs, having the option to share in a Holy Day meal and to attend a congregate worship service." (*Id.*)

This letter thus made clear that, while the aspect of Plaintiff's motion seeking to be exempt from all work and programming on April 21 had been mooted with respect to *April 21, 2014* (when Defendants voluntarily excused Plaintiff from such activities), that part of Plaintiff's claim was no longer moot for future celebrations of that holiday. Similarly, the McKoy letter left open questions regarding the adequacy of the privileges that would be provided to Plaintiff on the May 25 holiday, and also left certain other issues open to judicial resolution, including whether DOCCS should be required to provide Plaintiff with a special Holy Day meal on each of the holidays in question, and whether any meals that would be provided would be consistent with his religious beliefs.

### C.     The Evidentiary Hearing and Post-Hearing Submissions

Despite Defendants' protest that they were not prepared for an evidentiary hearing (*see* Dkt. 61), this Court proceeded to conduct the scheduled in-person hearing, on July 8 and 9, 2014. At the hearing, the Court heard testimony from Plaintiff, as well as from three defense witnesses: (1) defendant Cheryl Morris ("Morris"), the Director of Ministerial, Family and Volunteer Services at DOCCS; (2) Dr. Marcia Stewart ("Stewart"), the part-time Rastafari chaplain at DOCCS; and (3) Jean King ("King"), Deputy Superintendent of Program Services at Woodbourne Correctional Facility ("Woodbourne"), where Plaintiff is currently incarcerated. This Court accepted into evidence several exhibits, including: (a) the then-extant version of DOCCS Directive 4202, titled "Religious Programs and Practices" (*see* Def. Ex. A (Directive 4202, dated Jan. 18, 2008 ("Directive 4202"))); (b) an excerpt of the then-extant Religious Holy

Day Calendar 2014 ("Calendar") (*see* Def. Ex. B); (c) an excerpt of the then-extant 2014

Religious Menus ("Menus") (*see* Def. Ex. C); (d) DOCCS Directive 4760, titled "Inmate

Organizations" (*see* Def. Ex. D); (e) the full version of the Calendar (*see* Def. Ex. E); and (f) the

full version of the Menus (*see* Def. Ex. F).

At the close of the hearing, this Court directed Defendants to provide an authenticated

copy of the schedule of activities at Woodbourne to which King had referred in her testimony, as

King had suggested that, without referring to that schedule, she was not fully able to determine

the availability of space for Friday Sabbath services.  (*See* July Tr., at 239 (King's testimony).)

This Court further directed the parties to submit any proposed findings of fact and conclusions of

law by July 18, 2014.  (*See generally* July Tr.; Dkt. 63.)

On July 15, Defendants filed a declaration by King, attaching as an exhibit a schedule of

activities at Woodbourne for the period from June 28 to July 29, 2014.  (*See* Declaration of Jean

G. King, undated ("King Decl.") (Dkt. 68); Monthly Activities Schedule Day & Evening time for

June 28th to July 29th 2014 ("July Schedule") (Dkt. 68-1).)  In her declaration, King stated,

*inter alia*:

> As the Monthly Activities Schedule indicates, Rastafarian inmates
> are provided space for services in Room 14 on Wednesday and[,]
> on the third week, Thursday, and space for meeting in Room 4 on
> Friday.  Because Rastafarian services involve the burning of
> incense, the space provided on Friday, Room 4, cannot be used for
> services as lighting incense would pose a fire hazard in that space.
> Room 14 does not pose the same hazard because it is located near
> a security officer station.

(King Decl. ¶ 3.)  Defendants later re-filed King's declaration with an additional document

listing the permitted occupancy of various rooms at Woodbourne (*see* Woodbourne Correctional

Facility Room Capacity Numbers as Designed for Academic, Industrial or Fire Code Purposes

(Dkt. 71-2)), which was apparently inadvertently omitted from the original filing.  Defendants

also submitted, along with the courtesy copy of these documents, a letter to King from Woodbourne's fire safety officer regarding the square footage and occupant load of the classrooms.  (*See* Dkt. 72-2.)

On July 18, 2014, Defendants then filed a declaration by counsel, stating that the DOCCS policy regarding religious accommodations, Directive 4202, had been revised and would soon be re-published, and that, under the revised directive, "Plaintiff will be allowed to wear a turban." (Declaration of Michael J. Keane, undated ("Keane Decl.") (Dkt. 69) ¶¶ 2-3.)

Finally, on July 19, 2014, Defendants submitted proposed findings of fact and conclusions of law (*see* Defendants' Proposed Findings of Fact and Conclusions of Law ("Def. Proposed Findings") (Dkt. 70)), and on July 24, 2014, Defendants submitted a copy of the revised Directive 4202 (*see* Declaration of Anna M. Hehenberger, dated July 24, 2014, Ex. A ("Revised Directive 4202") (Dkt. 72-1)).

This Court also received several post-hearing submissions from Plaintiff:

(1)      by letter dated July 17, 2014, Plaintiff stated that he had not been transported back to Woodbourne from MCC until the afternoon of July 14, 2014, and that he did not anticipate being able to file his proposed findings of fact and conclusions of law until July 30, 2014 (*see* Dkt. 74);

(2)      by declaration dated July 18, 2014, Plaintiff asserted that "the area that was once used for the Radio [and] TV repairs, is unoccupied, and has been for quite some time," but confirmed that Room 4 could not be used for Rastafari services (Dkt. 73);

(3)      by letter dated July 22, 2014, Plaintiff enclosed the declarations of five individuals, stating that they are also Rastafari inmates at Woodbourne, and that they

share Plaintiff's belief that Rastafari congregate services should be held on Friday afternoons (Dkt. 76);

(4)     by letter dated July 28, 2014, Plaintiff stated that he was "overwhelmed" by the proceedings; that defense counsel appeared to be referring to a Sikh turban when describing what Plaintiff would be allowed to wear under the new directive; that the three-dollar limitation on supplementing holy day menus (as described by Morris at the July 8-9 hearing) effectively prohibited the Rastafari community from supplementing holy day meals, because the cost for fresh produce would exceed the limitation; that Defendants have not been unable, but simply unwilling, to find space for Friday worship; and that, if left in place, the requirement to contribute 50 percent of their funds to the general population would impede the Rastafari community's ability to fund its religious needs (*see* Dkt. 77); and

(5)     by letter dated July 29, 2014, Plaintiff stated that he had received Defendants' Revised Directive 4202 and found that nothing in it addressed his turban. (*See* Dkt. 78.)

**D.     Continuation of Hearing, by Telephone**

Upon review of the post-hearing submissions made by both parties, this Court determined that additional testimony was necessary to clarify the record, in particular with respect to the availability of suitable space for Rastafari Friday services. The Court therefore held a telephonic hearing on August 12, 2014 (*see* Dkt. 75), at which Plaintiff and King gave further sworn testimony (*see* Transcript of Proceedings, dated Aug. 12, 2014 ("Aug. Tr.") (Dkt. 83)).

During the August hearing, Defendants faxed to the Court the monthly activities schedule for Woodbourne for the month of August 2014. (*See* August 2014 – Monthly Activities

Schedule for Evening ("August Schedule") (Dkt. 86.)  In addition, on August 26, 2014, Defendants submitted revised versions of the Calendar (*see* Religious Holy Day Calendar (Revised 07/29/14) ("Revised Calendar") (Dkt. 82-1)) and religious menus (*see* 2014 Religious Menus ("Revised Menus") (Dkt. 82-2)).  Plaintiff also submitted a letter, dated August 27, 2014, asserting that Defendants' revisions to their policies had not addressed his concerns.  (Dkt. 87.)

Based on its consideration of the witnesses' testimony and credibility, Defendants' post-hearing submissions, and the rest of the record that has been developed to date, this Court makes the following preliminary findings of fact and conclusions of law.

## **FINDINGS OF FACT**

Plaintiff has practiced the Rastafari faith since the age of 13 or 14, and has been taught a system of Rastafari religious rituals.  (*See* July Tr., at 9-10.)  In particular, he identifies with the Nyabinghi Foundation school of Rastafari, which he believes requires him to follow a more disciplined life than some other schools of the faith.  (*Id.* at 9, 11-12.)  Plaintiff believes in the divinity of Emperor Haile Selassie of Ethiopia (*see id.*), and he regards Marcus Messiah Garvey as a prophet who shaped his identity and enlightened him that Emperor Selassie is his redeemer (*see id.* at 10, 24).  This Court finds that Plaintiff's testimony as to his personal religious beliefs was entirely credible.[7]  Moreover, to the extent Plaintiff testified regarding the general practices and tenets of his religion, his testimony was overwhelmingly echoed by the testimony of Stewart, a witness whom Defendants themselves put forward as knowledgeable about the Rastafari faith

---

[7] In coming to this conclusion, this Court has considered Plaintiff's demeanor while testifying in person at the July 8-9, 2014 hearing and the large degree of consonance among that testimony, his testimony at the March 27, 2014 and August 12, 2014 telephonic hearings, the allegations in his Amended Complaint, and his written submissions in connection with this preliminary injunction motion.  (*See generally* July Tr.; Aug. Tr.; Am. Compl.; Dkts. 20, 25.)

and whose credentials in that regard are considerable.[8]  (*See* July Tr., at 139 (defendant Morris

referring to Stewart as a "worldwide religious expert").)

    **A.**    **Religious Turban**

    As an initial matter, this Court accepts Plaintiff's general assertion that, in the past,

Defendants promoted the tenets of one Rastafari mansion[9] – the Ba Beta Kristiyan Church of

Haile Selassie ("Ba Beta Kristiyan Church") – over the tenets of any others, including the

Nyabinghi Foundation school to which Plaintiff belongs.  Plaintiff has consistently maintained

that the prior Rastafari chaplain for DOCCS, Ascento Foxe ("Foxe"), who headed the Ba Beta

Kristiyan Church, did not acknowledge or address the religious needs of Rastafari inmates who

did not belong to his own particular mansion.  (*See* Am. Compl. ¶¶ 25, 29-31[10]; *see also*

Transcript of Telephonic Hearing, dated Mar. 27, 2014 (Dkt. 25), at 38 (Plaintiff stating that

Foxe refused to minister to Rastafari who were not baptized within his church).)

    Plaintiff's contention in this regard is not seriously in dispute in this case.  In several

respects, Defendants have conceded the accuracy of Plaintiff's contention about the insular

views of DOCCS' prior Rastafari chaplain, and the exclusionary practices that resulted.

---

    [8] Stewart has served as the Rastafari chaplain for DOCCS since January 2014.  (July Tr., at 169-72.)  Her litany of qualifications includes master's degrees in clinical social work and psychotherapy and doctorates in divinity, Biblical studies, and religion.  (*Id.*)  She was initiated as a queen mother of the empire of the Almighty Rastafari Kingdom of the Ark in the early 1990s, and is a Rastafari delegate to the United Nations, the World Intellectual Property Organization, and the African Union, as well as the chief education officer for the Empress of Zion non-profit organization.  (*Id.*)  She has been involved in prison ministry in various states since 1990, and is a visiting professor at Emory University.  (*See id.*)

    [9] The terms "school," "mansion," and "order" are used interchangeably herein to refer to sects or subgroups of the Rastafari faith.

    [10] The allegations in Amended Complaint were made by Plaintiff under penalty of perjury.  (*See* Am. Compl., at 14.)

(*See, e.g.*, Def. Proposed Findings, at 5 (recognizing that the Rastarafi holidays that were placed on DOCCS' religious calendar prior to 2012 were particular to the Ba Beta Kristiyan Church, and did not include holidays observed by other Rastafari mansions).)  Indeed, Morris, who has served as DOCCS' Director of Ministerial, Family, and Volunteer Services since August 2010, testified that, at the time she took on that position, the DOCCS' religious calendar acknowledged, for those of the Rastafari faith, the "belief system" of "only" the Ba Beta Kristiyan Church.  (July Tr., at 101.)  Stewart, the current Rastafari chaplain for DOCCS, testified even more strongly on this subject.  She testified that DOCCS had hired her, in 2014, "to serve all of the members of the Rastafari faith, rather than what was in place previously, [where] that one mansion had manipulated the system."  (*Id.* at 208.)  She further explained that "the one mansion that had manipulated – that was in the system before, if you weren't part of that mansion, part of their teachings [were] actually against the other mansions."  (*Id.*)

This Court finds that one of the ways in which this favoritism negatively impacted Plaintiff was with respect to the type of religious headgear that he was permitted to wear.  At the time Plaintiff brought this suit, DOCCS allowed Rastafari men to wear a "tsalot kob" – described by Plaintiff as a "prayer cap which is indigenous to the Ba Beta Kristiyan Church" (Am. Compl. ¶¶ 20-21 & n.3) – but did not allow them to wear a turban, which is the religious headgear chosen by Plaintiff and by at least some members of the larger Rastafari community (July Tr., at 37-39 (Plaintiff's testimony), 204 (Stewart testifying that Bobo Ashanti males and some Nyabinghi males wear turbans)).

Stewart, whom this Court accepts as having substantial knowledge about the world-wide practices of members of different Rastafari mansions, testified to her understanding that members of the Nyabinghi order do wear turbans, and that, although it is also not a religious

11

*requirement* to wear one, it could be important for individual members of the Nyabinghi.
(*Id*. at 204-06.)  This Court finds that Plaintiff testified credibly to his own, sincere religious
belief that he should wear a turban, representing, to him, "the complete discipline of the
Rastaman in terms of a priestly life," and fulfilling the command to "put on our breast plates of
righteousness, put on our turbans and become priests unto God."  (*Id.* at 37.)  Plaintiff further
testified credibly to his belief that, as a man of the Nyabinghi school, his head must be covered at
all times, except while praying (*see id.* at 38-39), and that a tsalot kob, which had been the only
head-covering permitted within DOCCS for Rastafari males, does not comport with his personal
beliefs.  While, at one point, during his incarceration, Plaintiff did wear a tsalot kob, he later
received a turban from his wife.  (*See id.* at 37-38.)  He then wore the turban for approximately
one-and-a-half months, until a sergeant informed him that he was not permitted to wear it.
(*See id.*)  Since being denied permission to wear a turban, Plaintiff has chosen to keep his head
uncovered, explaining that "if it's a choice between wearing something that I disagree with as
opposed to what I know I'm supposed to wear, I will wear nothing."  (*Id.* at 38-39.)  This Court
finds that Plaintiff's belief that he should wear a turban is central or important to his practice of
his Rastafari faith.

Plaintiff specifically described the turban that has religious significance to him as a single
long piece of cloth that is wrapped tightly around the head, similar in style to the type of
headwear that DOCCS has permitted Rastafari women to wear.[11]  As described by Plaintiff, this
turban differs markedly from than the tsalot kob pictured in the Calendar.  In contrast to the

---

[11] *See* July Tr., at 120 (Morris testifying that Rastafari women were permitted to wear a
"tsalot [s]asha"); Calendar, at 36 (picturing, in the top right corner, a woman wearing a tsalot
sasha, described as a "cloth scarf head covering; worn by women," wrapped tightly around her
head and hair); July Tr., at 277-78 (Plaintiff testifying that his turban looked "[a] little similar[]"
to the picture of the tsalot sasha, but "would be larger").

tightly wrapped turban, the tsalot kob is a loose-fitting cap, often crocheted or knitted, and sometimes referred to as a "crown."[12]  The turban that Plaintiff described as important to his faith also differs from the turban that DOCCS has historically permitted for men of the Sikh faith; that turban, as described in the DOCCS Calendar, is apparently constructed from two separate cloths, which, as pictured, form a rounded shape at the top of the head.[13]  Under the revised directive, Plaintiff – and, indeed, a male inmate belonging to any faith group – would apparently be allowed to wear the type of turban that had previously been permitted only for Sikh males.  (*See* Revised Calendar, at 37.)

**B.**    **Holy Days**

As noted above, DOCCS has conceded that its prior religious holiday calendar did not reflect holidays observed by many Rastafari.  As Plaintiff described it, certain "Christianized" holy days were recognized by the DOCCS Calendar, while more traditional Nyabinghi holy days were not.  (*See* Am. Compl. ¶¶ 16, 18 & n.2.)  In particular, with respect to Defendants' historical failure to accommodate the observance of April 21, which commemorates the day that Emperor Selassie visited Jamaica in 1966 and is known as "Grounation" or "Groundation" Day (*see* July Tr., at 178-79; *see also* McKoy Ltr.), Stewart testified that other dates had been put on the Calendar due to the prominence within DOCCS of the Ba Beta Kristiyan Church (*see* July

---

[12] *See* Calendar, at 36 (picturing, in the top center, a man wearing a tsalot kob, described as a "brimless, hemispheric, cap that can be made of cloth or can be knitted or crocheted"); July Tr., at 204 (Stewart testifying that many Nyabinghi men wear a knitted hat, which could be called a tam or a crown, and is called a tsalot kob by "just that one mansion"); *id.* at 42 (Plaintiff describing the tsalot kob as "typically . . . made of wool or acrylic").

[13] *Compare* Calendar, at 36 (picturing, in the bottom center, a man wearing a turban, described as "consist[ing] of two pieces of cloth – an under turban that measures up to 60" x 60" and an outer turban that measures 66" x 30") *with* July Tr., at 278 (Plaintiff describing his own turban as 72 inches long and 24 inches wide).

Tr., at 182), but that April 21 is a "high holy day[]" (*id.* at 176, 179-80); that it is "so important" that there is "always a celebration" (*id.* at 178, 180); and that it is celebrated by all mansions (*id.* at 183).

This Court is persuaded of the sincerity and centrality of Plaintiff's beliefs that April 21 should be celebrated by coming together with other Rastafari believers for a congregate service called a "reasoning" and a shared meal, and by refraining from work (*see* July Tr., at 13 (Plaintiff testifying about how he observes April 21)), and that the other holy days at issue on Plaintiff's motion should be celebrated in the same manner (*see id.* at 25-26 (Plaintiff testifying that "[t]here is no real distinction" in how April 21, May 25, and August 17 are celebrated; *see id.* at 26 (Plaintiff testifying that there is also no difference in practice as to October 7)). As to May 25, which commemorates the day that Emperor Selassie inaugurated the Organization of African Unity[14] (*see id.* at 24); August 17, which is the birthday of the Rastafari prophet Marcus Garvey (*see id.*); and October 7, which celebrates Emperor Selassie becoming king of Ethiopia and is known as Negus Day (*see* Tr., at 183-84 (Stewart testifying about Negus Day); McKoy Ltr.), Plaintiff testified: "When it comes to Emperor Selassie I don't see celebrating anything to do with his majesty as being separate" (*id.* at 24), and "[i]f it was not for [Marcus Garvey] we would not know that Emperor Selassie is the one who fulfilled prophecy" (*id.* at 25). Plaintiff, however, did not testify or present other evidence about the significance of family participation in the celebrations for any of the subject holy days.

Plaintiff testified that, as a member of the Foundation, he does not eat eggs, dairy, meat, shellfish, or food from the vine, including grapes, although other Rastafari may. (*See id.* at 11,

---

[14] Although the transcript suggests that this description was about April 21, rather than May 25 (*see* July Tr., at 24), this appears to be an error, as it is undisputed that May 25 is known as "OAU [*i.e.*, Organization of African Unity] Day."

21, 27-28.)  While incarcerated, he does eat fish, as "the lesser of all evils."  (*Id.* at 14.)  Plaintiff also testified that, with respect to holy days in particular, only Rastafari cooks are permitted to prepare the meals, which typically involve ital stew (consisting of beans, potatoes, and other vegetables),[15] rice and peas[16] prepared with coconut milk, and fruit juice.  (*Id.* at 14-15, 17.) Stewart confirmed that Nyabinghi are vegetarian, and that many Rastafari do not eat vine food or eggs.  (*See id.* at 211-12, 219.)  This Court finds that Plaintiff's professed religious dietary scruples, which were generally consistent with Stewart's described understandings of Nyabinghi practices and were unrefuted by any evidence in the record, are both sincere and central to his Rastafari faith.

As set out above, DOCCS has now, during the pendency of this litigation, revised its Calendar to include each of the four holy days that are at issue on Plaintiff's motion.  (*See* McKoy Ltr.; Revised Calendar, at 25.)  The Revised Calendar, however, does not allow for the full scope of observances that Plaintiff has requested.  In particular, while, on August 17 and October 7, Rastafari will now be allowed to attend a worship service, share a holy day meal, and be exempt from work and programming, the same will not be true for April 21 (where DOCCS will permit members of the Rastafari faith to participate in a congregate worship service, but not to have a holy day meal or to be fully exempt from work and programming) or for May 25 (where DOCCS is not authorizing a worship service, a holy day meal, or a work/programming exemption).  (*See id.*)  Further, none of the four subject holy days is designated as a "family event."  (*See id.*)

---

[15] Stewart explained that "ital" means "natural" in the Rastafari language, and that, outside of prison, ital foods are not prepared in the same pots as meat.  (*See* July Tr., at 219-21.)

[16] "Peas" here are pigeon peas or other beans.  (*See* July Tr., at 72 (Plaintiff's testimony).)

Morris testified that, in the calendar revisions, April 21 received "lesser accommodation" by DOCCS, because "it may not have the same significance to a practicing Rastafarian in the U.K. or parts of Africa" as it would in Jamaica (*id.* at 189), and thus "was not considered more global" (*id.*). This Court, however, does not credit Morris's supposition that April 21 is not a globally significant Rastafari holy day, as that view was expressly repudiated by Stewart (*id.* at 217 (Stewart testifying: "I don't believe that at all. All over the world[,] that day [April 21], wherever there is Rastafari, is celebrated, in Africa, in Europe, in Canada, in the Caribbean. . . . It is universal."), and as Morris lacks Stewarts' broad knowledge of the faith, admittedly being aware of only "[s]ome" of its tenets (*id.* at 144). Defendants offered no explanation for the limited scope of observance that will now be allowed on May 25.

Defendants represent that, for days that are designated in the Calendar as having holy day meals (so-called "meal consideration") for particular faith groups, those groups can supplement the menu provided by purchasing additional food items with money from their own accounts. (*See id.* at 112 (Morris's testimony).) According to Morris, any additional food must be purchased from an approved vendor or donated by an approved organization, and the cost per person cannot exceed $3.00 (*id.* at 113; *see also* Def. Ex. F); kitchen staff will then prepare both the main meal and the supplemental food.[17]   (*See* July Tr., at 114.) While Plaintiff testified that the menu is "mandatory" and cannot be supplemented (*see id.* at 71-72, 74), this Court does not find that, at this point, Plaintiff has adequately demonstrated this fact, given Defendants' representation that their official policy is to the contrary (*see* Def. Ex. F, at 1; Revised Menus).

---

[17] Morris testified that, if an individual, as opposed to an entire faith group, wishes to have different food on a holiday, he may buy it from the commissary, but DOCCS will not make different preparations on an individual basis. (*See id.* at 113-14.) She further testified that individuals can also "eat off the line" in the mess hall on holy days, instead of eating the religious meal. (*Id.* at 114.)

### C.   **Friday Worship**

This Court accepts the sincerity of Plaintiff's stated belief that the time from sundown on Friday to sundown on Saturday is sacred, as the Rastafari Sabbath, and that he should not work or prepare food during that time, but rather contemplate the Creator.  (July Tr., at 12.)  This Court similarly accepts as sincere Plaintiff's professed belief that Friday afternoon is the appropriate time for Rastafari congregate worship, "because it takes [the congregation] right into the [S]abbath" and allows observers time after the service to prepare meals for Saturday (*id.* at 30-31, 33), although religious services can properly overlap with sundown (*see id.* at 69; *see also* Aug. Tr., at 28 ("It could be later as long as it's leading into the Sabbath.")).  It is undisputed that Rastafari religious services require the burning of incense and the use of candles, to sanctify the room and to represent "the purifying fire."  (Aug. Tr., at 6-7.)  According to Plaintiff, services usually last about two hours, and are typically followed by religious classes of approximately the same duration, although such classes can be held on days other than Friday.  (*See id.* at 4.)

Stewart confirmed that, while Friday congregate worship is only a *requirement* for members of the Bobo Ashanti mansion, she could "safely say most [individuals in other mansions] do observe that the [S]abbath begins at sundown on Friday through sundown on Saturday.  That is the general acceptance."  (July Tr., at 206.)  She also acknowledged that it was "[d]efinitely" possible for Nyabinghis to adopt the Bobo Ashanti practice of observing Friday services (*id.* at 213), stating that she, herself (a member of the Twelve Tribes of Israel and a part of the Nyabinghi orders), attends such Sabbath services (*see id.*).  In light of Plaintiff's credible testimony regarding his beliefs and Stewart's confirmation of the period of the Rastafari Sabbath, this Court rejects Defendants' suggestion that restricting Plaintiff from observing the Sabbath on

Friday with a congregate service would be a mere inconvenience, rather than a violation of a central tenet of his religion.  (*See* Def. Proposed Findings, at 16.)

Defendants presented evidence, including King's testimony[18] and the written activities schedules for the months of July and August, purporting to demonstrate a lack of available space at Woodbourne for Friday worship services.  During the tenure of the previous chaplains, Woodbourne held Rastafari religious services on Thursdays, as that was when those chaplains were available to come to the facility.  (*See* July Tr., at 236.)  Weekly religious services were temporarily discontinued when those chaplains left DOCCS.  (*Id.*)  At an inmate's request, Woodbourne reinstated weekly religious services for the Rastafari community, and the facility selected Wednesday as the day for such services, purportedly because space was available on that day.  (*See id.*)  Defendants still permit members of the Rastafari faith to hold their worship services only on Wednesdays (and occasional Thursdays).  (*See* Aug. Tr., at 13 (King testifying that, during the third week of each month, Rastafari services are held on Thursday due to a conflict with staff training on Wednesday).)  Defendants also provide meeting space for the Rastafari community on Friday evenings in Room 4 of the classroom building, although, as Defendants prohibit the burning of incense in that room, the Rastafari community has not been permitted to hold services there.  (*See* King Decl. ¶ 3; Dkt. 73.)

Afternoon programming at Woodbourne takes place from 12:30-3:30 p.m., followed by time for recreation, showers, the headcount, and dinner; evening programming begins at 6:30 p.m.  (Aug. Tr., at 5-6 (King's testimony).)  Woodbourne appears to lack a consistent

---

[18] King has worked for DOCCS for over 30 years in various facilities.  (*See* July Tr., at 222-23.)  She served first as a teacher, and then as an education supervisor, assistant deputy superintendent, deputy superintendent, and acting superintendent, before becoming Deputy Superintendent of Program Services at Woodbourne.  (*See id.*)

procedure by which inmates may request space for religious use and by which the facility evaluates such requests. (*Compare id.* at 35-36 (King testifying that if a new faith group were to request space, she would examine the group's proposal and bring it to the executive team consisting of the superintendent, King, deputy superintendent for security, deputy superintendent for administration, and the captain) *with id.* at 37 (King testifying that if the Rastafari community were to request to move their services, "I suppose in this case now I would go [to] Dr. Stewart and ask for her blessing if you will, since she is the chaplain of religions")).)

According to King, only certain space within Woodbourne is appropriate for religious services. King testified that, although there are two religious chapels (a Protestant chapel and a Catholic chapel) that are not currently being used for religious services on Fridays, those spaces, in general, are reserved for the sole use of the Protestant and Catholic communities. (*See* July Tr., at 240, 243-44 (King's testimony); *see also* King Decl. ¶ 4.) King defended this policy by explaining that the Protestant community is the largest faith group at Woodbourne, and that the Ministerial Program Coordinator had requested that the Protestant chapel not be closed to Protestants to make room for "other activities." (*See* King Decl. ¶ 4; July Tr., at 240.) She also testified that she had been informed that, if the Catholic chapel were to be used by any other faith group, it would then have to be blessed by a bishop before mass could be held there again. (*See* July Tr., at 244.) Absent the use of the chapels, the space at Woodbourne that is potentially available for religious services consists of various other rooms, mostly classrooms. (*See* King Decl. ¶ 5; Def. Ex. B.)

King testified that Rastafari services are currently held in Room 14 (a classroom), because that room, unlike the other classrooms, has exterior ventilation (*see* Aug. Tr., at 7), and DOCCS staff members "don't appreciate the burning of the incense or the smelling of the

incense[,] and the scent far outlasts the service" (*id.* at 46).  Plaintiff, however, testified that the Rastafari community used Room 6A/6B – an interior space – whenever there were holy day services, and that incense was also used for those services.  (Aug. Tr., at 27.)  Further, King herself admitted that Room 6A/6B had been used for regular weekly services "[w]hen the Rastafarian chaplains were present."  (*Id.* at 7.)  Although she testified that she "[thought] in [her] observations over the years the chaplains were more moderate" in their use of incense than unsupervised inmates (*id.* at 10-11), Plaintiff disputed the accuracy of this, testifying that the inmates follow the same process and use the same amount of incense as the chaplains, if not less, as they are "more conscious of the effects it has on everybody else when it seeps outside of the room" (*id.* at 11).  On this point, this Court credits Plaintiff's firsthand knowledge regarding the use of incense over King's apparently vague recollection.

King also attempted to justify Defendants' position that interior rooms could not be used for Rastafari services by making references to fire safety and security, as opposed to ventilation. In that regard, King suggested that, when a civilian chaplain had been present for services, it had been more acceptable for the inmates to use an interior room for their services, because the civilian presence in the room "ma[de] a little bit of a difference" for safety and supervision.  (*Id.* at 10.)  Defendants offered no explanation, however, as to why, as a general matter, safety and security concerns would be implicated to a greater extent in interior rooms, than in exterior Room 14, where Rastafari services are currently held.  King did state, by declaration, that the key difference between Room 4 (where Rastafari inmates are currently permitted to have classroom study on Friday evenings) and Room 14 (where they have services on Wednesdays and some Thursdays) is that "lighting incense would pose a fire hazard" in Room 4, more than it would pose such a risk in Room 14, because the latter is located closer to a security officer station.

(King Decl. ¶ 3.)[19]  It does not appear, though, that the same security justification could exist

with respect to all other interior rooms.  King testified, for example, that the security coverage

for Room 11 (an interior classroom) is roughly equivalent to that of Room 14 (*see* Aug. Tr.,

at 16), and Plaintiff testified that, during holy day celebrations held in Room 6A/6B, when

incense and candles are used, the security officer remains "right outside at his desk . . . where he

is always stationed" (*id.* at 27).

Given the logical flaws in Defendants' various professed rationales for insisting that

Rastafari Sabbath services cannot be held in any interior classrooms at Woodbourne, this Court

has serious doubts as to whether any of those rationales was, in fact, the reason why Defendants

failed to accommodate Plaintiff's request for Friday services, or whether Defendants simply

failed to undertake any meaningful effort to explore the possibilities.  In any event, even if this

Court were to credit one of Defendants' rationales as to why Room 14 would be the only

acceptable space for such services, Defendants' own evidence indicates that, while Room 14

may not currently be available on Friday afternoons, it *is* available on Friday evenings.  King, in

fact, confirmed this during the August 12, 2014 telephonic hearing.  (*See id.* at 30.)  While

Plaintiff implied that a Friday evening service would be less ideal than an afternoon service

(which could lead into meal preparation and Sabbath study (*see* July Tr., at 30-31, 33; Aug Tr., at

3-4, 28)), he also testified that Sabbath services could be held later on Fridays, without

conflicting with his personal religious beliefs (*see* July Tr., at 69 ("Q.  So there is nothing

---

[19] King similarly testified that the area previously used for radio and television repairs
which, according to Plaintiff, was available for Friday services (*see* Dkt. 73), was not suitable for
Rastafari services due to "limited security supervision."  (Aug. Tr., at 14.)

religiously significant about the precise time of day?  A.  No.  Q.  Can a religious service overlap with sundown?  A.  Yes, it could.")[20]).

### D.   **Fundraising**

Inmate organizations that wish to raise funds for various purposes can do so by selling goods to the general population.  (*See id.* at 265-66 (Plaintiff's testimony).)  It is undisputed that DOCCS requires any religious group that wishes to engage in such fundraising to form a special purpose organization, subject to Directive 4760.  (*See id.* at 43 (Plaintiff's testimony); Def. Ex. D.)  This directive requires inmate organizations, including religious groups, to donate 50 percent of their fundraising profits for the benefit of the general population.  (*See* July Tr., at 43-44, 119; Def. Ex. D.)  Groups are required to turn over the 50 percent at the end of the fiscal year, which falls around March 30 to April 1, but they can also turn it over incrementally throughout the year, by purchasing items for the general population or donating funds to facility family events.  (*See id.* at 266-67.)

### **CONCLUSIONS OF LAW**

## I.   **APPLICABLE LEGAL STANDARDS**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  The Second Circuit has

---

[20] While, at one point, Plaintiff testified that it was required that congregate worship be "in the afternoons" (July Tr., at 68), the Court understands his full testimony to reflect a belief that the Sabbath service could not be held *earlier* than in the afternoon, although it could be held later on Friday evening (*see* Aug. Tr., at 28 (testifying that the Friday service "cannot be earlier . . . [but] [i]t could be later as long as it's leading into the Sabbath"); *see also* July Tr., at 61 (testifying that he observes the Sabbath "Friday afternoon, Friday evening sundown to Saturday evening sundown")).

traditionally articulated the preliminary injunction standard, which it has reiterated in the wake of

the Supreme Court's decision in *Winter*, as requiring the moving party to show:  "(a) irreparable

harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions

going to the merits to make them a fair ground for litigation and a balance of hardships tipping

decidedly toward the party requesting the preliminary relief."  *Citigroup Global Markets, Inc. v.*

*VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35-38 (2d Cir. 2010) (internal

citations omitted).[21]

      Where the moving party seeks to enjoin "government action taken in the public interest

pursuant to a statutory or regulatory scheme," the more rigorous "likelihood of success" standard

applies.  *Id.* at 35 n.4 (internal citations omitted).  Moreover, where the moving party seeks a

mandatory preliminary injunction that "alter[s] the status quo by commanding some positive

act," the injunction should issue "only upon a clear showing that the moving party is entitled to

the relief requested, or where extreme or very serious damage will result from a denial of

preliminary relief."  *Id.* (internal quotation marks and citations omitted).  Finally, "[w]henever a

request for preliminary injunction implicates public interests, a court should give some

consideration to the balance of such interests in deciding whether a plaintiff's threatened

irreparable injury and probability of success on the merits warrants injunctive relief."

*Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999) (quoting *Time*

*Warner Cable of New York City v. Bloomberg L.P.*, 118 F.3d 917, 929 (2d Cir. 1997)).

---

[21] In particular, the circuit affirmed the continued vitality of the "serious questions" standard, holding that "our venerable standard for assessing a movant's probability of success on the merits remains valid."  *Citigroup Global Markets*, 598 F.3d at 38.

## II.    **PLAINTIFF'S CLAIMS**

### A.    **Irreparable Harm**

Irreparable harm is "the single most important prerequisite for issuance of a preliminary injunction," *Rodriguez*, 175 F.3d at 233-34 (internal quotation marks and citations omitted), and in order to demonstrate it, a plaintiff must show that he "will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm," *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks and citations omitted).

All of Plaintiff's claims implicate, in various ways, Plaintiff's First Amendment right to the free exercise of his religion, and such claims are generally accorded a presumption of irreparable harm.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").  A bare allegation of loss of a First Amendment freedom, however, is insufficient to invoke this presumption.  Instead, the Second Circuit has made clear that a movant is only entitled to this presumption where a plaintiff "alleges injury from a rule or regulation that *directly limits* [a First Amendment right]."  *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003) (emphasis added); *see also Amaker v. Fischer*, 453 F. App'x 59, 63 (2d Cir. 2011) ("The implementation of Directive 4913 [regarding possession of legal papers by inmate plaintiff] directly limited [plaintiff]'s speech . . . .  Irreparable harm may normally be presumed under such circumstances." (citing *Bronx Household*)).  In contrast, "where a plaintiff alleges injury from a rule or regulation that may only *potentially* affect [a First Amendment right], the plaintiff must establish a causal link between the injunction sought and the alleged injury, that is, the plaintiff must demonstrate that the injunction will prevent the feared

deprivation of [First Amendment] rights." *Bronx Household*, 331 F.3d at 350 (emphasis added); *see also Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999) (finding a "conjectural chill" on speech insufficient to establish irreparable harm).

With respect to the wearing of a religious turban, it is clear that Defendants' prohibition against Plaintiff's wearing of a turban, of the type he claims is important to his religious beliefs, directly limits Plaintiff's First Amendment right to the free exercise of his religion.  Similarly, Defendants' decisions not to allow congregate Rastafari worship on Fridays and not to recognize certain Rastafari holy days directly limit Plaintiff's ability to exercise his religion.  In these instances, where Defendants' policies directly dictate Plaintiff's ability to engage in certain religious practices that he has described as important to his faith, irreparable harm may be presumed.  *Bronx Household*, 331 F.3d at 349; *see also Keesh v. Smith*, No. 04cv0779, 2006 WL 513793, *1, *3 (N.D.N.Y. 2006) (finding irreparable harm may be presumed where inmate plaintiff alleged DOCS denied requests for "religious diet, holiday observances, programming, and access to religious items and literature" because the alleged First Amendment injury "resulted directly from the defendant's policy" of enforcing Directive 4202).

In addition, as Defendants seemingly concede by advancing no argument to the contrary, in none of these instances is the claimed harm so "remote" or "speculative" as to preclude issuance of a preliminary injunction.  *Grand River Enter. Six Nations, Ltd.* 481 F.3d at 66. Regarding the religious turban, Plaintiff's claimed harm is present and ongoing, as he is currently being prevented from wearing the type of turban he seeks to wear.  The same is true with respect to Friday worship services, as the alleged deprivation is presently occurring, every week.  With respect to the observance of holy days, DOCCS' own published calendar confirms the alleged denial of privileges, and shows that they are scheduled to occur on definite and annually

repeating dates, with the next relevant date quickly approaching on October 7, 2014.  Under these circumstances, this Court finds that the injury that Plaintiff would suffer without an injunction for each of these claimed deprivations is sufficiently "actual and imminent" to constitute irreparable harm.  *See Freydel v. New York Hosp.*, 242 F.3d 365, *5 (2d Cir. 2000) (summary order; noting, in determining whether a plaintiff had standing to seek injunctive relief, that "[a] plaintiff must allege a future encounter with the defendant which is likely to lead to a similar violation of some protected right" (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983))).

With respect to Plaintiff's final claim, however – *i.e.*, his claim that Defendants are violating his free exercise rights by requiring the Rastafari inmate organization to turn over half of its fundraising profits – the First Amendment harm alleged by Plaintiff is more attenuated from the official conduct he is challenging.  Liberally construing Plaintiff's claim, as the Court is obliged to do on behalf of a *pro se* litigant, *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (collecting authority), this Court understands him to allege that Defendants are engaging in an ongoing practice of appropriating funds that would otherwise be used for religious purposes, including for the support of religious events.  (*See* July Tr., at 267 (Plaintiff testifying that "[w]e would also be able to purchase iconography and other materials, including funding our religious events").)  Yet, without any further detail in the record regarding these funds and their use, it is difficult for this Court to conclude that Defendants' alleged practice of appropriating funds is actually serving as a "direct" limitation on Plaintiff's exercise of his religion, thereby invoking the presumption of irreparable harm.  *See Bronx Household*, 331 F.3d at 349-50.  On this claim, Plaintiff's allegations that Defendants' conduct is effectively limiting the practice of his faith appear more conjectural, suggesting that Plaintiff may be

required to establish a "causal link" between the conduct he seeks to enjoin and the injury he

alleges. *See id.* For purposes of deciding Plaintiff's motion, though, the Court need not resolve

these issues, as, on the current record and for the reasons discussed below, Plaintiff has, in any

event, failed to demonstrate a likelihood of success on the merits of this claim.

      **B.**      **Likelihood of Success on the Merits**

To prevail on a Free Exercise claim, a plaintiff must show that "the disputed conduct

substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263,

274-75 (2d Cir. 2006). It is not necessary, in making this threshold showing, for plaintiffs to

show that "they either have been prevented from doing something their religion says they must,

or compelled to do something their religion forbids"; rather, they need only show that the

disputed conduct burdens a religious practice that was "central or important" to their practice of

their religion. *Ford v. McGinnis*, 352 F.3d 582, 593-94 (2d Cir. 2003) (Sotomayor, C.J.).

It is well-established that prisoners "retain some measure of the constitutional protection

afforded by the First Amendment's Free Exercise Clause," *Ford*, 352 F.3d at 588 (citing *Pell v.

Procunier*, 417 U.S. 817, 822 (1974)), though, due to deference to the complex administrative

decisions made in the prison context, their free exercise claims are "judged under a

'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of

fundamental constitutional rights," *Farid v. Smith*, 850 F.2d 917, 925 (2d Cir. 1988) (quoting

*O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)). Under this "reasonableness" test,

official action impinging on inmates' constitutional rights is valid "if it is reasonably related to

legitimate penological interests."[22] *Turner v. Safley*, 482 U.S. 78, 89-91 (1987); *Salahuddin*, 467

---

      [22] The same analysis applies whether the challenged action is a prison regulation or an
individual decision. *See Ford*, 352 F.3d at 595 n.15.

F.3d at 274.  Guiding the application of this test are four factors:  (1) the existence of a "valid, rational connection" between the action and the legitimate governmental interest put forward to justify it; (2) whether or not inmates have alternative means for exercising their rights; (3) the "ripple effect" that accommodation of the asserted rights would have on guards, other inmates, and the allocation of prison resources; and (4) the absence of alternative accommodations.  *See Turner*, 482 U.S. at 89-91; *Salahuddin*, 467 F.3d at 274. [23]

This Court now considers whether Plaintiff has made the requisite showing that Defendants' current policies substantially burden his sincerely held beliefs, and whether, to the extent that they do, they are not reasonably related to legitimate penological interests, such that Plaintiff is entitled to preliminary relief.  With respect to his requests to require Defendants to change the privileges he would be afforded for certain holy days and to schedule congregate worship on Fridays, Plaintiff seeks to alter the *status quo*, such that he must meet the more rigorous standard for a mandatory preliminary injunction, which demands "a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief."  *Citigroup Global Markets, Inc.*, 598 F.3d at 35 n.4 (internal citations omitted).  With respect to Plaintiff's requests to enjoin Defendants from enforcing the policies that would prevent him from wearing a Rastafari turban and that would

---

[23] Given that the Free Exercise claims of prisoners are, in this way, judged under a different test than that applied to the claims of other plaintiffs, it is an open question whether prisoners must still make the threshold "substantial burden" showing.  (*See supra*.)  Although the Second Circuit has declined to decide this question, the circuit court has at least assumed that such a threshold showing is still required, where the parties have not argued otherwise.  *See Ford*, 352 F.3d at 591-92 (assuming that the substantial burden test applies, where the plaintiff did not argue otherwise and the parties did not brief the issue); *see also Salahuddin*, 467 F.3d at 275 n.5 (declining to decide the parties' dispute about whether the substantial burden test applies, where resolution of the summary judgment motion did not require it).

require the Rastafari community to surrender half of its fundraising proceeds, this Court analyzes
Plaintiff's claims under the less stringent standard for a prohibitory injunction.

### 1.   **Religious Turban**

Plaintiff has demonstrated a likelihood of success on the merits of his claim that he
should be permitted to wear a religious turban.  As noted above, this Court finds credible
Plaintiff's testimony about the religious significance, to him, of wearing a turban.  This Court
further finds that wearing a turban is "central or important" to Plaintiff's Rastafari faith, *see
Ford*, 352 F.3d at 593-94, as evidenced by Plaintiff's testimony, and further supported by
Stewart's.  Thus, this Court finds that Plaintiff can likely show that the denial of permission to
wear a turban while incarcerated constitutes a substantial burden on his First Amendment right to
exercise his religion.  *Salahuddin*, 467 F.3d at 274-75; *Ford*, 352 F.3d at 593-94.  Moreover,
Plaintiff can likely show that this burden is ongoing and has not been rendered moot by the
revisions to Directive 4202, as Defendants have given no indication that, under the revised
directive, Plaintiff would be permitted to wear a turban – even one made of cloth in the permitted
dimensions – in the tightly wrapped manner that is important to him, rather than in the manner
depicted in the Revised Calendar.

Even under the less restrictive test applicable to impingements on inmates' constitutional
rights in the prison context, *Farid*, 850 F.2d at 925, Plaintiff will likely be able to show that
Defendants' prohibition on wearing a turban is invalid, *see Turner*, 482 U.S. at 89-91.
Defendants point to security concerns as the "legitimate penological interest" justifying their
action.[24]  Defendants have not explained why, under the version of Directive 4202 that was

---

[24] In their proposed findings of fact and conclusions of law, Defendants argue that "[f]or
security reasons *as well as administrative reasons*, DOCCS is constrained to provide for

operative when Plaintiff commenced this action, Rastafari men were not allowed to wear turbans, especially where the large and loose-fitting tsalot kob was permitted.  Although King testified at the hearing that "[s]ecurity is everything in a correctional facility" and that she believed that "security could perceive an inmate hiding some sort of contraband under [a turban]" (July Tr., at 233), her suggestion of such security concerns was purely speculative.  In fact, when this Court asked her if she had "any understanding as to why the concern about concealment of contraband might exist for a turban, but not for crocheted or knitted headgear" (*i.e.*, the tsalot kob that Plaintiff was permitted to wear (*id*. at 260)), she answered simply, "I can't reconcile the two" (*id*.).

At the July hearing, Defendants offered no rationale for the proposition that Plaintiff's wearing of a Rastafari turban would have created any security risk that would not equally have been posed by his (permitted) wearing of a tsalot kob, by a Rastafari woman's (permitted) wearing of the tsalot sasha, or by a Sikh man's (permitted) wearing of a turban in the style pictured in the Calendar.  Nor have Defendants offered any "security" rationale for their apparent current view (as manifest in the revised directive) that it would now be acceptable for Plaintiff to wear the type of turban that had previously been permitted for Sikh males (*see* Revised Calendar, at 37), but not the different style of turban that Plaintiff considers important to his own faith.

It thus appears that there is no "valid, rational connection" between Defendants' action and their purported security concerns.  This alone defeats the disputed policy, as such a rational connection "is not simply a consideration to be weighed but rather an essential requirement."

---

uniformity and conformity in the headgear it approves inmates to wear."  (Def. Proposed Findings, at 10 (emphasis added).)  The current record, however, including the hearing testimony that Defendants cite, does not even identify the "administrative reasons" that purportedly require Defendants to "provide for uniformity and conformity" in the wearing of religious turbans, let alone support them.

*Salahuddin*, 467 F.3d at 274.  Accordingly, this Court finds that Plaintiff has met his burden of showing that that he is likely to succeed on the merits of his claim that he should be permitted to wear a turban of the type he described at the July hearing.

### 2.    Holy Days

As noted above, during the pendency of Plaintiff's motion, DOCCS has added all of the holy days at issue to the Calendar, with varying limitations about the way that each day may be observed.  (*See* McKoy Ltr.; Revised Calendar.)  This Court must address whether Plaintiff is entitled to an injunction with respect to those requests that have not been voluntarily accommodated, which include:  (1) exemption from work and provision of a shared meal on April 21 and May 25, and permission for a congregate worship service on May 25; (2) the designation of April 21 and August 17 as "family events"; and (3) non-mandatory menus for holy day meals.

### a.    Scope of Privileges for April 21 and May 25

This Court finds, as noted above, that Plaintiff sincerely believes that April 21 and May 25 – and indeed, all the other subject holy days – should be celebrated by refraining from work, attending a congregate worship service, and sharing a meal consistent with his religious diet, which prohibits the consumption of meat (except for fish with scales), dairy, eggs, vine food, and shellfish (*see* July Tr., at 20, 24-26 (Plaintiff's testimony)), and that such beliefs are "central or important" to Plaintiff's Rastafari faith, *see Ford*, 352 F.3d at 593-94.

Plaintiff can also likely show that Defendants' decision to limit Rastafaris' observance of April 21 to a congregate service (without an exemption from work and programming) and May 25 to individual worship (without either a congregate service or a work/programming exemption) is not reasonably related to legitimate penological interests.  Defendants have

identified, as their purported justification for that decision, a general interest in ease of administration of the prison system.  (*See* Def. Proposed Findings, at 6.)  Although Plaintiff retains the burden of demonstrating the irrationality or unreasonableness of these purported justifications, this Court finds that he has shown a clear likelihood of success in doing so.

King testified that DOCCS cannot exempt inmates from work and programming on every holiday, because there could be "up to 200 people on any given day not going to a program and [DOCCS] can't manage a facility that way."  (July Tr., at 250.)  She further explained that it impacts facility operations when an inmate who normally works in the mess hall or as a porter does not work on a given day.  (*Id.* at 117, 159.)  While this Court does not doubt that it affects facility administration to allow inmates to be exempt from work and programming on religious holidays, King's testimony does not explain why such exemptions are manageable for some Rastafari holy days (such as August 17 and October 7), but not for April 21 or May 25.  Similarly, this Court does not doubt that the facility must juggle a limited number of spaces to accommodate various groups and activities, but nothing in the record explains why Woodbourne can find space for congregate worship and a holy day meal for some Rastafari holy days (again, such as August 17 and October 7), but not for April 21 or May 25.  Morris also suggested, generally, that Defendants cannot exempt inmates from work or provide menu considerations for every holy day, because they must "look at the costs" (*id.* at 153), but there is nothing in the record to suggest that DOCCS did in fact "look at the costs" when making decisions about how to accommodate these particular holidays, let alone that an additional two days of work exemptions and holy day meals would be unduly expensive.  Rather, Morris testified only to her belief that the decisions about April 21, May 5, August 17, and October 7 were made by Deputy Commissioner McKoy, and vaguely explained her understanding that those decisions were based

on the allegations in the instant lawsuit and what DOCCS could do "that would not cause major disruptions to facility operations."  (*Id.* at 154.)

Morris also testified that DOCCS's goal is to have four exemptions from work and programming per year, for each religious group (*see id.* at 154), and that it limits such exemptions so as not to interfere with inmates' programming, some of which may have been assessed by the Parole Board[25] (*see id.* at 153).  Despite that stated goal, the Calendar indicates significant discrepancies in the number of holy days that members of different faith groups are permitted to celebrate, and the scope of privileges accompanying those celebrations.  (*See* Def. Ex. E (indicating, *inter alia*, nine holy days for Native Americans, on all of which observant inmates receive work exemptions and special meals, and at least 17 for Jewish inmates, on seven of which observant inmates receive *both* work exemptions and special meals, and on four of which observant inmates receive either one or the other); Revised Calendar (same).)  These discrepancies further undermine Defendants' explanation that allowing two additional Rastafari holy day observances – which would bring the total number of annual work exemptions and holy day meals for the Rastafari community to eight (*see* Revised Calendar, at 25) – would significantly hamper the efficient administration of the facility or unduly interfere with programming for those inmates who choose to observe.

On the record, Plaintiff has made a clear showing that he will likely be able to demonstrate the absence of a "valid, rational connection" between Defendants' refusal to accommodate the requested scope of Plaintiff's religious beliefs for April 21 and May 25 and their purported reasons for that refusal.  *See Salahuddin*, 467 F.3d at 274.  Plaintiff has therefore

---

[25] DOCCS has, according to Morris, received complaints from inmates that they have been forced to choose between their religion and their programs, non-attendance at which may jeopardize their parole eligibility.  (*See* July Tr., at 155-56.)

shown the requisite likelihood of success on his claims that, on both of these two Rastafari holy days (as on the other holy days he has identified), he should be permitted to be exempt from work and programming, to attend a congregate worship service, and to share a holy day meal with others of his faith.

### b. Requested Designation of April 21 and August 17 as "Family Events"

Plaintiff also seeks to have April 21 and August 17 designated as "family events," where inmates' families are invited to the facility to celebrate. (*See* July Tr., at 82-83.) As to this portion of Plaintiff's claim, and on the record presented, Plaintiff has not demonstrated a clear entitlement to relief.

Plaintiff testified that August 17, the birthday of Marcus Garvey, should be celebrated in the same manner as July 23, which is the birthday of Emperor Selassie and which, in DOCCS, is already celebrated with a "family event." (*See* July Tr., at 24; McKoy Ltr.; Def. Ex. E, at 25). He also testified that April 21 is "a big celebration." (July Tr., at 82.) Yet, while the Amended Complaint alleges generally that "Rastafari family is the center of Rasta society, and celebrations are communal events" (Am. Compl. ¶ 16 n.1),[26] there is no evidence in the current record about the *religious* significance of the family event itself, as distinct from the congregate worship service or other aspects of holy day observance. Nor has Plaintiff explained why a family event would be important to his faith for April 21 and August 17, but not for the other subject holy days. (*See* July Tr., at 82 (Plaintiff testifying that, for May 25 and October 7, "[t]hose days as they've put them back on the calendar are satisfactory, because we still get communal celebrations").)

---

[26] As noted above, Plaintiff made the allegations in the Amended Complaint under penalty of perjury. (*See* Am. Compl.)

This Court finds that Plaintiff has not shown, at this time, that celebrating April 21 or August 17 with family is "central or important" to his religious beliefs, and thus has not demonstrated a clear likelihood of success on the merits of this claim, *see Salahuddin*, 467 F.3d at 274-75; *Ford*, 352 F.3d at 593-94.  Accordingly, this Court recommends that this aspect of Plaintiff's motion for preliminary injunctive relief be denied.

### c.      Holy Day Menus

As discussed above (*see* Section II(B)(2)(a), *supra*), Plaintiff has shown that, consistent with his religious beliefs, he should be given the opportunity to share a holy day meal with other Rastafari inmates on *each* of the four holy days that are the subject of the motion, not just on the two days (August 17 and October 7) for which DOCCS has voluntarily opted to make such meals available.  (*See* Revised Calendar.)  To that extent, Plaintiff has shown an entitlement to preliminary injunctive relief.  I do not recommend, however, that, by way of a preliminary injunction, the Court either attempt to dictate either the details of the DOCCS menus or the ways in which those menus may be supplemented.

Plaintiff is not actually asking the Court to specify the contents of the holy day menus, but rather to enjoin DOCCS from making such menus "mandatory," as Plaintiff perceives the mandating of his diet on holy days to be an ecclesiastical act, and, as such, an improper one for the state.  (*See* July Tr., at 80 (Plaintiff testifying, "For the celebrations, the injunction that I'm asking for is to lift the mandatory nature of the menu.").)  Plaintiff contends that the menus are "mandatory" in practice, even if not on paper (*see id.* at 15 (Plaintiff testifying, "In 2014 DOCCS made [the menu] mandatory and said we can't change the menu."); Dkt. 77 (arguing that a purchase of fresh produce for one meal would exceed the $3.00 limitation)), and that, by denying the Rastafari community the ability to supplement the menu, it effectively "leaves the Nyabinghi

out" (July Tr., at 80), presumably because the menus developed by DOCCS over the years are more closely in line with the tenets of the Ba Beta Kristiyan Church and the former DOCCS chaplains.

As discussed below, however, it is not sufficiently clear on the record that the holy day meals specified by DOCCS *are* mandatory.  More importantly, Plaintiff has not demonstrated at this stage that Defendants' several policies regarding holy day meals are otherwise burdening Plaintiff's religious dietary scruples in any substantial way.  *See Turner*, 482 U.S. at 90-91; *Salahuddin*, 467 F.3d at 274-75.

Plaintiff testified credibly that his central religious beliefs prohibit the consumption of meat (except for fish with scales), dairy, eggs, vine food, and shellfish.  It seems apparent from the revised menus submitted to the Court that, for at least August 17 and October 7, DOCCS intends to offer a Rastafari holy day meal that is essentially equivalent to the meal that had previously been offered for the July 23, 2014 holiday (one of the holidays that was on the prior Calendar and thus is not at issue here).  (*Compare* Menus, at 80, with *Revised Menus*, at 81-82.) That meal consists of fresh fruit, salad with Italian dressing, fish, chicken, baked potato, bean and rice casserole, fresh cabbage, wheat bread with margarine, vanilla ice cream, and grape juice.  (*See* Revised Menus at 81-82.)  According to Stewart, although she would recommend that another kind of juice besides grape juice be served, as many Rastafari (like Plaintiff) do not eat "vine food" (July Tr., at 212),[27] this menu would still generally satisfy the religious dietary requirements of most Rastafari mansions, as it provides sufficient variety to allow vegetarians to eat, as well as those who eat fish or chicken (*see id.* at 211-12).

---

[27] Consistent with an argument that has been advanced by Plaintiff, Stewart also noted that the choice of "Italian" salad dressing could be offensive to the Rastafari community, as it could evoke the attempted colonization of Ethiopia by Italy.  (*See id.* at 218.)

36

Morris testified that members of a given faith group also have several options with respect to holy day meals: (1) they can, on an individual basis, eat only those components of the special holy day meal that satisfy their religious dietary requirements; (2) they can, on an individual basis, choose to eat "off the line" in the mess hall, which includes a "meatless alternative" option; (3) they can, on an individual basis, purchase and prepare their own food in their cells; or (4) they can, as a group, purchase supplemental food items, up to $3.00 per person, which kitchen staff will then prepare along with the regular menu items.[28] (*See* July Tr., at 112-115, 145-46.) Plaintiff has not explained why any of these various alternatives would substantially burden his religious beliefs. *See Salahuddin*, 467 F.3d at 274-75.

Finally, this Court is persuaded that Defendants have offered a legitimate penological interest in developing holy day menus and in limiting the amount by which those menus may be supplemented by inmate groups, including religious groups. According to Morris, DOCCS sets the menu in advance for all meals, including religious events, because it must do "head counts" and plan for every component of an event. (*See* July Tr., at 111.) Morris further testified that DOCCS instituted the $3.00-per-person limitation on supplementing the menus because, prior to that policy change, "there was no control mechanism and tracking mechanism and ordering food was just out of control," making it difficult for the facilities to process the food requests. (*Id.* at 149.) She stated that, prior to the limitations going into effect, groups had been ordering more food than was needed; some inmates hoarded leftover food, against policy; and some inmates who were not adherents of the faith would "sneak into" religious celebrations to get food, causing conflict. (*See id.* at 161.) Given this testimony, this Court concludes that there appears

---

[28] The record is not clear as to whether, if individuals were to choose to eat "off the line" or to prepare their own food on a holy day, they would then be permitted to bring that food into the space where the rest of the faith group would be sharing a holy day meal.

to be a "valid, rational connection" between Defendants' holy day meal policies and their stated justifications for implementing them. *See Turner*, 482 U.S. at 90-91; *Salahuddin*, 467 F.3d at 274.

Under the circumstances, I do not recommend issuing the preliminary injunction that Plaintiff requests – *i.e.*, one that prohibits Defendants from making particular holy day meals "mandatory." While any Rastafari holy day meal that DOCCS offers should be sufficient to enable Plaintiff – whether through the meal itself or available alternatives – to eat and drink within the dietary restrictions of his faith (*i.e.*, vegetarian, without eggs, dairy, shellfish, or vine food), Plaintiff has not demonstrated, on the current record, that Defendants' actual practice falls short of this mark.

### 3.    Friday Worship

This Court finds that Plaintiff has a sincerely held religious belief that he should observe the Rastafari Sabbath by engaging in congregate religious services on Friday afternoons, and that Friday Sabbath observance is central or important to his faith. Defendants have primarily articulated a lack of suitable space in Woodbourne as their legitimate penological interest in not accommodating Plaintiff's request for Friday worship, arguing, in particular, that the number of rooms that could be made available for Rastafari services is quite limited because of ventilation and safety concerns. (*See* July Tr., at 237 (King's testimony); King Decl. ¶ 7.) Defendants also seem to argue that, regardless of the availability of space, they have a legitimate interest in not changing the schedule for group worship on the basis of an individual request, such as Plaintiff's. (*See* July Tr., at 247 (King's testimony).) Applying the *Turner* factors, *see Turner*, 482 U.S. at 89-91, this Court finds that Plaintiff is likely to be able to show that Defendants' impingement

of his right to Sabbath congregate service is not "reasonably related" to Defendants' stated interests.

First, as described above, the principal justifications that Defendants have advanced as to why various rooms cannot even be considered for use for Rastafari services (*i.e.*, that interior rooms have insufficient ventilation and are located too far from a security post) are too inconsistent or belied by Defendants' past practices to be considered "rational."  *See Turner*, 482 U.S. at 89-90; *see also* Findings of Fact, *supra*, at Section C.  The very fact that Defendants have, in the past, allowed Rastafari weekly services to be held in an interior classroom calls into serious question whether there is any "valid rational connection" between their refusal to allow Friday Sabbath services for the Rastafari in any interior classroom and their professed concerns that such rooms have inadequate ventilation and security.  While Defendants note that interior rooms may also be currently occupied for institutional "programming" of various types, this additional argument fails to take into consideration the First Amendment implications of prioritizing other matters over religious liberties.

Defendant's other proffered justification for their refusal to consider the accommodation requested by Plaintiff – that it would be inappropriate to make room changes based on a single inmate's request (*see* July Tr., at 247-49) – is also belied by Defendants' own prior conduct (*see* July Tr., at 236 (King testifying that weekly Rastafari services were resumed, after the departure of the former DOCCS chaplains, at the request of "[o]ne of the inmates"); *see also id.* at 258 (King testifying that, as a result of Plaintiff's previous individual request for Friday worship in a room formerly used by the Food Service Administrator, King checked the room schedule and inquired into the availability of the room)).  Defendants have also submitted no authority for the proposition that an individual's religious beliefs need only be accommodated in a prison setting

if those beliefs are shared by some critical mass of others, and, even beyond that, Defendants have offered no evidence to suggest that the views of other Rastafari inmates are in conflict with Plaintiff's views regarding the day when Sabbath services should be held.  In contrast, Plaintiff has submitted the declarations of several individuals, who are not parties to this action, but who state that they are Rastafari inmates at Woodbourne who, like Plaintiff, "have an issue with Wednesday services" and whose "understanding of Rastafari worship is that our services are held on Friday afternoons."[29]  Stewart's hearing testimony has further confirmed that Plaintiff's beliefs regarding Friday services are shared within the larger Rastafari community.  (*See* July Tr., at 206, 213.)  The record thus contains a fair amount of evidence that other inmates share Plaintiff's belief that services should be held on Fridays, and it contains absolutely no evidence to the contrary.

As to the second *Turner* factor, absent relief, Rastafari inmates, including Plaintiff, would have no "alternative means" for exercising their religious right to Sabbath worship.  *See Turner*, 482 U.S. at 90.  Plaintiff simply has no alternative means of exercising his religious beliefs with respect to congregate worship; by necessity, during his incarceration, he must rely on Defendants to provide an authorized gathering place where services may be held.

Third, it does not appear that any other inmates or staff would suffer an adverse "ripple effect," *id.*, from the use of an otherwise unoccupied room for Rastafari Sabbath services.  In this regard, the Court does note that Room 14, which, according to Defendants, is the preferable location for Rastafari services because of its ventilation, is currently being used on Friday

---

[29] Declaration of Avaldo Austin, dated July 22, 2014 (Dkt. 76, at 2); Declaration of Ronald Messan, dated July 22, 2014 (Dkt. 76, at 4); Declaration of Devon Geddes, dated July 22, 2014 (Dkt. 76, at 5); Declaration of Dwight Young, dated July 22, 2014 (Dkt. 76, at 6); *see also* Declaration of Curtis Sterling, dated July 22, 2014 (Dkt. 76, at 3).

afternoons by the Nation of Islam, for that group's own religious services.  The Court inquired of King whether the Nation of Islam also used incense, such that ventilation was a concern, and King testified, "They do not."  (Aug. Tr., at 17.)  The Court then asked whether, under those circumstances, any consideration had been given to moving the Nation of Islam to a different room, so as to be able to accommodate the Rastafari services in Room 14, and King testified that "there was no consideration given there," but that "[i]t could be considered."  (*Id.*)  While Plaintiff has expressed a desire not to displace any other religious group, this Court notes that a simple trade of rooms, for the same day and time, and based solely upon the particular worship needs of the religious groups, should not have any significant "ripple effect."

Finally, under *Turner*, this Court should consider whether there is an "absence of ready alternatives."  *Turner*, 482 U.S. at 90.  Here, while Defendants had never offered any alternatives to Plaintiff, the record is clear that at least one viable alternative exists.  At the August hearing, in response to questions by the Court, King conceded that a suitable space for Rastafari services – Room 14, the exterior classroom where such services are currently being held on Wednesdays and Thursdays – is available on Friday *evenings*.  (*See* Aug Tr., at 30 (King's testimony).)  Plaintiff has testified that, although not ideal, holding Sabbath services on Friday evenings would still be consistent with his faith, and thus it appears that, at a minimum, an alternative accommodation would be readily available here, at no cost to Defendants.[30]  It is difficult to see how Defendants' flat denial of Plaintiff's request for Friday afternoon Sabbath services could in

---

[30] Affording the Rastafari community space for a Friday evening service would apparently necessitate moving existing Rastafari study classes (currently on Friday evenings) to a different day or time, but, based on the most recent classroom schedule that this Court has viewed (*see* August Schedule), this would seem to be a relatively simple matter.  (*See* Aug. Tr., at 17 (King testifying that, while no consideration had previously been given to allowing Rastafari inmates to use Room 14 on Friday evenings for religious services, "[i]t could be considered."))

fact have been grounded in legitimate penological interests, where it is apparent that Defendants denied the request without first conducting a reasonable inquiry as to potential alternatives that could satisfy constitutional requirements.

Based on the *Turner* factors, viewed as a whole, this Court finds that Plaintiff can likely show that Defendants' conduct in denying any Friday Sabbath services for Plaintiff is not reasonably related to a legitimate penological interest, *see Turner*, 482 U.S. at 89-91, and that he is therefore entitled to relief on this claim.

### 4.    Fundraising

Plaintiff seeks to prohibit Defendants from collecting half of the Rastafari inmate organization's fundraising proceeds.  The Court notes that Plaintiff may not have standing to bring this claim, as the funds in question are not his personal funds, but rather funds raised, held, and expended by an organization not named as a plaintiff here.  Even assuming *arguendo* that Plaintiff may prosecute this claim, he has not demonstrated the likelihood of success on the merits necessary for a grant of preliminary relief.  *See Citigroup Global Markets, Inc.*, 598 F.3d at 35-38.

While Plaintiff has indicated that, at least if it were up to him, the organization's fundraising proceeds would be used "to purchase iconography and other materials, including funding our religious events" (July Tr., at 267), Plaintiff has not shown the religious significance, to him, of any particular iconography or event-related purchase.  Certainly, on the record before the Court, Plaintiff has not demonstrated that any contemplated uses of the funds implicate beliefs that are "central or important" to his faith, let alone that the deprivation of half of the funds constitutes a "substantial burden" on those beliefs.  *See Salahuddin*, 467 F.3d at 274-75.

As Plaintiff has not met his burden, even under the less stringent standard for a prohibitory injunction, this Court need not consider whether Defendants' conduct is reasonably related to a legitimate penological interest.  On the current record, I recommend that Plaintiff's motion for a preliminary injunction be denied with respect to his claim challenging Defendants' appropriation of 50 percent of the funds raised by the Rastafari inmate organization.

## C.    BALANCE OF EQUITIES AND PUBLIC INTEREST

As described above, this Court finds that Plaintiff has satisfied his burden of demonstrating that he would face irreparable harm in the absence of preliminary relief, and that he has made the requisite showing of a likelihood of success on the merits, with respect to the following of his claims:  (1) that he should be permitted to wear a Rastafari religious turban; (2) that he should be permitted to observe the Rastafari holy days of April 21 and May 25 (as well as the other identified holy days of August 17 and October 7) by refraining from working or attending programs, by attending a congregate worship service, and by sharing a holy day meal with the Rastafari inmate community; and (3) that he should be permitted to attend congregate Rastafari Sabbath services on Fridays.  The only remaining question with respect to these claims is whether the balance of equities and considerations of the public interest nevertheless weigh against the issuance of preliminary relief.  This Court concludes that they do not, and that a preliminary injunction should issue.

Certainly there is no inherent public interest in denying Plaintiff the right to exercise his religion, and, indeed, there is a strong public interest in permitting him to do so.  Directive 4202 states that, "in pursuit of the objective of assisting inmates to live as law abiding citizens, it is the intent of [DOCCS] . . . to provide as many opportunities as feasible for the practice of their chosen faiths consistent with the safe and secure operations of [DOCCS's] correctional

43

facilities." (Def. Ex. A.)  While there are undoubtedly public interests in the safe, efficient and cost-effective administration of the prison system, nothing in the record suggests that providing privileges for these additional holy days, switching the day of weekly worship, or allowing Plaintiff to wear a turban would negatively impact such interests in any material way.

Moreover, the balance of equities tips in favor of granting Plaintiff preliminary relief on these claims.  Even if Defendants were ultimately to prevail in this litigation, they would have faced minimal hardship by allowing Plaintiff, for a limited period of time, to wear a turban, to worship on a different day of the week, and to observe two already designated holy days (April 21 and May 25) with privileges that are consistent with those that DOCCS itself has been willing to afford Plaintiff on other Rastafari holy days.  In contrast, if Plaintiff were to prevail, without having been granted preliminary relief on these claims, he will continue, in the interim, to suffer substantial and irreparable impingements on his constitutional rights.

## CONCLUSION

For the foregoing reasons, I recommend that Plaintiff's motion for a preliminary injunction be GRANTED, to the extent that Defendants should be mandatorily enjoined, on a preliminary basis:

> (1)     to allow Plaintiff to wear a Rastafari religious turban,

> (2)     to allow Plaintiff to observe all four of the Rastafari holy days at issue on his motion, including April 21 and May 25, by (a) refraining from working or attending programs, (b) attending a congregate worship service, and (c) eating a holy day meal with other Rastafari inmates; and

> (3)     to provide space for Rastafari Sabbath worship services on Friday afternoons, or, at least, pending the final resolution of this case on its merits, to provide an alternative accommodation for such services on Friday evenings.

I recommend that Plaintiff's motion otherwise be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6 (allowing three additional days for service by mail).  **Although the Court will mail a copy of this Report and Recommendation to Plaintiff, the Court also directs Defendants' counsel to fax a copy to the facility where Plaintiff is currently incarcerated, with the direction that it be provided to Plaintiff immediately, given the short time frame of the objection period and the ongoing nature of the alleged constitutional violations.**

Any objections to this Report and Recommendation, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable P. Kevin Castel, United States Courthouse, 500 Pearl Street, Room 1020, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York, 10007.  Any requests for an extension of time for filing objections must be directed to Judge Castel.  As Plaintiff is proceeding in this action *pro se*, any submissions he makes to the Court (including any objections to this Report and Recommendation for filing, any courtesy copies for judges' chambers, and any requests for extensions of time) should be mailed by him to the Court's *Pro Se* Office.

FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d

1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v.*

*Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38

(2d Cir. 1983).

Dated: New York, New York
    September 11, 2014

                                        Respectfully submitted,


                                        DEBRA FREEMAN
                                        United States Magistrate Judge

Copies to:

The Honorable P. Kevin Castel, U.S.D.J.

Mr. Randolph Rossi
91A3680
Woodbourne Correctional Facility
99 Prison Road
P.O. Box 1000
Woodbourne, NY  12788-1000

Counsel for Defendants (via ECF)